## THE DREW.[1]

### THE COE F. YOUNG.

### BREWERS' ICE CO. *v.* THE DREW and another.

### NEW JERSEY STEAM-BOAT CO. *v.* THE COE F. YOUNG.

*(District Court, S. D. New York. September 15, 1885.)*

1. COLLISION—STEAMER AND TUG—CIRCLING COURSE—INSUFFICIENT CARE—REPEATING SIGNALS—INSPECTORS' RULE 3—SEASONABLE MANEUVERS NECESSARY.

   The tug Y., with a barge lashed on her starboard side, was coming slowly down the North river against the flood-tide, and was some 300 to 600 feet distant from pier 40, on the New York side. The steamer Drew came down the river near the Jersey shore, and turned to cross to her pier in New York. The tug's witnesses testified that two whistles were given the Drew when the latter was about in mid-stream, but no reply was received; that when the Drew was close to the tug, and heading nearly up the river, she whistled once, to which the tug replied with one, and ported her wheel, when, seeing that the collision was inevitable, she stopped and reversed. The Drew's witnesses asserted that one whistle was given to the tug when the steamer was about in mid-stream; that no reply being received, the Drew first slowed, one whistle was given again, when near the tug, and then her engines were stopped; that the tug then whistled once, and took a sheer to the west, throwing the barge on the bows of the Drew. For the damage the barge libeled both the steamer and the tug, and the Drew brought suit against the tug for the injuries sustained by her. *Held*, that both steamers were in fault,—the Drew, because she did not take betimes such steps to avoid a collision as her circling course rendered unusually necessary, and on failing to get an answer to her whistles, did not, in time, repeat the signal; the tug, because insufficient precautions against collision were taken by her, and also on account of a defective lookout.

2. SAME—PILOT RELYING ON LOOKOUT—PILOT'S VIEW OBSCURED.

   The barge, which was lashed to the side of the tug, was higher than the latter, and the large pilot-house of the barge obstructed the view of the pilot of the tug on that side. For the navigation of the tug her pilot relied on the directions of a seaman stationed as a lookout on the upper deck of the barge. Experts differed as to whether, under such circumstances, the pilot should rely on such a lookout, or go himself on the higher vessel and give orders to a subordinate at the wheel. *Held*, that the method of navigation adopted by

[1] Reported by R. D. and Edward G. Benedict, Esqs., of the New York bar.

the tug is not justifiable, unless the pilot's substitute, whether in the pilot-house of the tug or on the higher vessel giving directions, be fully competent for the peculiar duties assigned him. Between the two the tug and tow must be handled with competent skill to avoid all avoidable collisions.

In Admiralty.

*Carpenter & Mosher,* for Brewers' Ice Co.

*W. P. Prentice,* for the Drew.

*Benedict, Taft & Benedict,* for the Coe F. Young.

BROWN, J. In the libel first above named, the libelants, as owners of the barge Henry W. Smith and her cargo of ice, seek to recover their damages incurred through a collision with the steam-boat Drew, about 7 o'clock in the morning of December 14, 1883, in the North river somewhere from 300 to 600 feet distant from pier 40. The barge had been picked up at Bank street by the steam-tug Coe F. Young, was lashed to her starboard side, and bound for the East river. The tide was flood. The Drew had come down the North river, and after passing along Hoboken, within 600 or 800 feet of the shore, had crossed the river, passed below the tug, and rounded to for the purpose of making her slip at pier 41, heading up river. In doing so her stem struck the barge upon her starboard side, a short distance from her stem, causing both some damage.

The second libel was filed by the owners of the Drew to recover her damages through the alleged negligence of the steam-tug Young.

The witnesses on behalf of the steam-tug testify that the tug was making against the tide from one to two miles per hour; that she was about 500 or 600 feet off from the end of pier 41, proceeding straight down the river; that the Drew was first seen when astern of them and near the Jersey shore; that after passing the coal docks she turned to cross the river and round to; that the tug gave her two whistles when the Drew was about in mid-river, and heading nearly across some three or four piers below the tug, but got no reply; that the Drew continued on till she bore only a little to starboard of the tug, and when heading nearly directly up river, and from 200 to 300 feet off, gave a signal of one whistle, to which the tug made reply with one; that the tug at the same time ported so as to sheer a little to the right; but seeing that collision was imminent, very shortly after reversed her engines and backed, the effect of which was to bring her head either directly down river or a little towards the New York shore at the time of the collision; and that she was at that time going backwards by land.

The captain of the barge for the most part agrees with and con-firms the witnesses of the steam-tug, except that he says the signal of two whistles was given when the Drew was astern of abeam, and near to the Jersey shore. The witnesses on the part of the Drew testify that she was coming down full speed, at the rate of 12 or 14 miles an hour, near the Jersey shore; that in rounding to, when about in the middle of the river, she first observed the tug and barge near

pier 42, to which she gave a signal of one whistle; that no reply being received, the Drew's engines were slowed, and a second signal of one whistle given when about 1,000 or 1,200 feet from the tug; that the Drew was then pretty near the New York shore, and was heading nearly up river towards her pier 41; that, receiving no reply, her engines were stopped and then reversed, and when within 75 feet only of the tug the latter gave a signal of one whistle, and took a sheer to the westward, throwing the barge upon the bows of the Drew, which was the immediate cause of the collision.

Numerous witnesses have been examined upon each side. The controversy as to which was in fault has been sharp and strenuous. In the statement of details and the estimates of position, of distances, and of intervals of time, there is great diversity. If a correct decision of the case could only be reached through an exact determination of the precise facts in all these particulars, it would be difficult to come to any satisfactory conclusion. But the obligation of steamers to avoid each other is imposed by rules so well defined, and, where there are no obstructions to navigation, as in this case, their duty to allow ample margin for the common safety, and to take prompt and timely measures to secure it, is so clear, that the responsibility of either or both vessels cannot be narrowed down to what was or was not done, or to what might or might not have been done, within the narrow limits of time and space just preceding the collision. The obligations of each were to take seasonable notice of the other, and to do seasonably what belonged to each to do to keep out of danger. It is clear that the Drew did not do this. She was under an obligation to take special care, because she had approached from behind, was proposing to cross the river across the course of the tug, and round to between the tug and the shore. Her course in doing so was a curved one, which could not be precisely calculated on by the tug, but was under the control of the Drew. Having the whole breadth of the river at her command, it was her duty so to shape her course as to avoid the tug by an ample margin, by going either completely inside of her before she was reached, or else by keeping on the outside of her so as to pass astern. Instead of this she practically put herself directly in the way of the tug, and then, by backing, nearly stopped till both were brought together at probably no greater rate of speed than the drifting of the tide. I am entirely satisfied that the position of the tug in the stream was not essentially changed by her sheer in connection with her subsequent backing. All the evidence on her part shows that she was going so slowly against the tide that the little change of her heading to the westward, and her subsequent return to the eastward on reversing her engine, could have made little, if any, difference in the result. The fault of the Drew, therefore, is that she did not take betimes such proper and necessary steps in her curving course as were obligatory upon her to avoid the tug and tow, by going either upon one side or the other, with a safe margin,

as it was easily in her power to do. Though she had shortly before given a signal of one whistle, implying that she would go to the right, she took no effective or sufficient measures to do so; and it is even made a ground of complaint against the tug that the tug ported, though that movement was in accordance with the Drew's own signal. The unavoidable inference is that the Drew adhered to the path she chose for herself, paying little heed to the tug, and turning neither to the right nor to the left, expecting that the tug would somehow get out of her way, until it was too late to avoid her.

A second clear fault of the Drew was her failure to repeat in time her first signal of one whistle, or else to give several short rapid blasts, as required by rule 3 of the inspectors' regulations; one of which duties was, I think, clearly obligatory upon her, under the circumstances of this case. The Drew's first signal was given when she was about in the middle of the river, and about a half mile distant from the tug. Her whistle was deep and low, and, according to some of the testimony, not likely to be heard much above that distance. It was not heard at all upon the barge or tug; nor by other witnesses upon the shore, who heard the other whistles. The circling course which the Drew proposed was so uncertain to the tug that a common understanding by signals was more than usually necessary. A reply from the tug should have been looked for on the Drew within 10 seconds, at the most, after her own signal; for the regulations require a reply to be given "promptly." None was heard. Considering the short distance of less than a half mile, her own low whistle, and the necessity of an immediate common understanding, the pilot of the Drew should have inferred, upon hearing no reply, the probability that his whistle had not been heard. He should therefore have repeated his signal, certainly within a quarter of a minute after his first, until he did get an answer; or, failing to get an answer, he should have given several short and rapid blasts of his steam-whistle as rule 3 requires, and, if then near, have reversed at once. Instead of doing either of these things, the evidence makes it clear that the Drew proceeded for at least a minute, and probably more, at the rate of from 10 to 12 miles per hour, without getting any answer and without giving any further signals. This is certain from the distance that the Drew must have run between her first whistle and her second; for none of her witnesses make her more than from 1,000 to 1,200 feet distant when the second was given, and other witnesses make her very much nearer, viz., within from 300 to 600 feet, while at her first whistle she was about a half mile away. If, in passing over this distance of 1,200 or 1,500 feet, or any part of it, she was going under a slow bell, as some of her witnesses allege, she must have run for nearly two minutes without repeating her signals, or coming to any understanding as to how she was to pass the tug, while her own course was all the time changing. The witnesses of the Drew all testified that they did not hear any whistle from the tug before their second whistle, consequently the

Drew failed entirely to understand the course or intention of the tug; that is, if she expected her to change at all from the direct course that she was pursuing. And failing thus to understand, it was her duty, under the inspectors' rule 3, to give danger signals before approaching so near as to involve immediate danger of collision. If, on the other hand, she did not expect the tug to do anything except keep her course, the Drew did not keep out of her way as, in that case, she was bound to do, though the tug, as I find, did nothing to thwart her.

The above considerations, while clearly sufficient, in my judgment, to make the Drew responsible, do not acquit the tug. For the purpose of avoiding collisions the law imposes two cardinal obligations: *First*, that each steamer, when collision is imminent, shall do all in her power to avert it, no matter what the previous faults, or which may have the right of way; *second*, as a means to this end, that a competent lookout shall be maintained, and sufficient means of observation and of management afforded to the pilot to see the coming danger in time to avert it. The evidence shows a breach of both these obligations on the part of the tug. The barge was lashed upon the starboard side of the tug and somewhat ahead of the latter. Her deck being higher than the deck of the tug, and her large pilot-house being also a little ahead of the tug's pilot-house, the view of the pilot of the tug upon his starboard side was entirely cut off from a little forward of abeam to nearly ahead. Her pilot testifies that he could see straight down river, and about one quarter across the river, which I take to mean not over two points off his starboard bow. In fact the pilot did not see the Drew at all from the time she passed behind the barge's pilot-house, when near the Jersey shore, until she emerged into view again on the other side of the barge's pilot-house, and within 200 feet of him. For the navigation of the tug the pilot relied upon the directions of a seaman stationed as a lookout on the upper deck of the barge to give him all necessary signals from that quarter.

It is manifest that the dangers of navigation are much increased by such methods. The seaman in such circumstances is charged with the performance of some of the essential and peculiar duties of a pilot. No mere verbal reports by him to the pilot concerning the direction and supposed distance and the course of another vessel which a pilot cannot see, can possibly serve the same purposes for the pilot's guidance as his own observation and practical judgment. The court is practically familiar with the total inadequacy of any such descriptions when attempted by seamen, or even by pilots themselves. If, on the other hand, the pilot simply obeys the seaman's directions as to the use of the helm and of the engines, letting the seaman form his own judgment as to what is necessary, then the pilot is, as regards dangers from the obscured quarter, but a mere wheelsman, and all the important functions of a pilot, the judgment, the command, the quick resource in danger, are transferred to a lookout. Never-

theless, the evidence shows that it is not uncommon for tugs to take in tow along-side barges and other craft that do thus materially obstruct the view from the pilot-house. The experts called to testify as to the proper management in such cases differed; some testifying that it was the pilot's duty to go upon the higher craft and give his directions to a substitute in the pilot-house, others testifying that the pilot should remain on his own tug and put the next best man on the higher vessel. Some good reasons are assigned for the opinion of each. It is not necessary to determine that either is necessarily wrong. But clearly neither is right, nor is such a method of navigation justifiable, unless the pilot's substitute, whether in the pilot-house of the tug, or on board the higher vessel giving directions, be fully competent for the peculiar duties assigned him. Between the two, the tug and tow must be handled with competent skill to avoid all avoidable collisions.

In this case the evidence shows that during all the crossing, the rounding, and the approach of the Drew, the lookout on the barge gave no sign, warning, or direction of any kind, to the pilot, save only two whistles, when the Drew was in mid-river, and that the Drew had given one whistle when within 200 or 300 feet, to which the pilot replied with one. This, in my judgment, was a service wholly inadequate to the situation, and shows clear negligence or incompetency in the lookout for the duties of the position, which were in fact those of a pilot or master. The lookout ought to have seen the Drew's one whistle, if given, as her witnesses all allege. The position of the tug was so near the shore, the Drew was so large a steamer, her destination was so well known, her necessary course was within so comparatively small limits, and the direction of her course so clear, that reasonable prudence, judgment, and skill clearly required the tug to take early measures to give the Drew plenty of margin for safety, and, for that purpose, to come to a proper early understanding by signals, and to repeat her own signals until an answer was obtained. Under the circumstances proved the tug should either have backed, or have changed her course to one side or the other, much earlier then she did, after a common understanding by signals, which neither sought to obtain. The collision would in that case have been easily avoided notwithstanding the Drew's fault. That the tug did not do either is, I think, due to the divided command, and the lack of timely directions given to the pilot by the lookout, in view of obvious danger that ought to have been perceived, and might have been averted; and the want of these directions arose from the lookout's lack of competency for a pilot's or master's duties. The damages must therefore be divided.